2-3-7 Vavaris v. United States Vavaris v. United States In this case, the Court of International Trade held that Sigvaris' graduated compression hosiery was specially designed to relieve symptoms suffered by people suffering from the incurable handicaps of chronic venous insufficiency and lymphedema. And frankly, the Court's analysis should have stopped there. Once the Court made those determinations, these products had satisfied the requirements for secondary classification under heading 98170096, which implements the Nairobi Protocol to the Florence Convention. And all that is required... But doesn't the statute focus on whether it was specifically designed for a person who suffers a substantial impairment of a life activity? It doesn't focus on what the nature of the handicap is. It focuses on the person and whether the person that it's designed for is one who suffers a substantial impairment of a major life activity. It does not focus on the person, Your Honor. It focuses on the impairment. The term in subheading defines physically or mentally handicapped person, not as consisting of people suffering from a physical impairment, which substantially limits one or more life activities, but including such persons. That's language of inclusion, Your Honors. I don't understand your answer. I read this as saying precisely that the term person, I mean, Judge O'Malley's point was that this is geared towards what the individual is doing, and that's exactly what it says. If the definition says includes any person, that means it's directed to that person who's suffering from a permanent or chronic physical or mental impairment that substantially limits yada-da. And even if, Your Honor, read the language that way, our products would qualify, because the people who use our products suffer from CVD and lymphedema. And those are physical impairments that substantially limit one or more life activities. They are chronic. They are incurable. They are progressive. They are ultimately debilitating. And they have symptoms. Now, the Nairobi Protocol does not require that the article in question treat symptoms. There are plenty of examples of articles that have been classified here that have nothing to do with symptoms at all, treat people who are completely asymptomatic. And in some cases the article treats symptoms. These articles happen to treat symptoms of these debilitating diseases. Well, the CIT concludes that the symptoms experienced in the early stages do not render someone physically handicapped. Well, the language in the note says impairment, which substantially limits one or more major life activities. If the court wants to disassociate the term impairment from the underlying condition, I think that presents a problem. I mean, a good example would be diabetes. Customs recognizes that diabetes is a condition that substantially impairs major life activities. And Customs routinely grants Nairobi Protocol treatment to things for the benefit of people with diabetes. Even things that do nothing to treat the symptoms. For example, a carrying case for a diabetes test kit or a blood glucose monitor. So these things do nothing for the symptoms, but they are designed for the use or for the benefit of people who are suffering from diabetes. Now, somebody suffering from diabetes may have any sort of a range of symptoms on a close to normal. But it's only normal because they're treating it. The test doesn't randomly become normal. It's only normal because they're testing their blood sugar, they're using insulin, they're taking the medication. Maybe they're getting treated. And in fact, it may be because they're taking insulin. Now insulin itself, not covered by the Nairobi Protocol, because the Nairobi Protocol doesn't cover drugs and medicines. But a device that tests somebody and tells them, yes, take insulin, no, don't take insulin. Because it's specifically designed for a person with a handicap, which is diabetes. It's designed, yes. It has been held to be specifically designed. It could actually, a blood glucose monitor could take the blood sugar level of somebody who doesn't have diabetes. Now in our case, our products really are specially designed. And the court recognized that because our products are engineered products. What they do is they apply pressure at the ankle, the greatest pressure, graduating up toward the calf. And the reason they do that is because the people they're designed for, remember the lower court said, this is specially designed for people suffering from CVD and lymphedema. Those people have vein conditions or lymphed conditions where the lymphatic system or the circulatory system does not move blood up back toward the heart. And when that happens to you, you are at the mercy of gravity. And for people who suffer that affliction, blood, lymph, fluid falls to the ground. It causes a very painful swelling of the legs and ankles. There's a better analogy here, rather than to people with diabetes, that if there's a product that's specifically designed for someone who might be at risk for diabetes at some point in the future, and the product helps them prevent that risk. Now in that case, it wouldn't be covered by the law. I wouldn't think something that was purely prophylactic would be covered, Your Honor. And isn't that essentially the findings, though, that were made here? That this is a situation where they're not suffering from a substantial impact on a major life function, but instead they are at risk of getting to that point. Oh, no, not at all. I mean, the lower court found that these products were designed for people who are suffering from CVD and lymphedema. So that's satisfying. Yes, there is that impairment. What the court said, though, and this is the court's fundamental mistake, the court decided, well, we're going to divide the disease. We're going to divide the handicap according to a spectrum of symptoms. I thought that he said that the court said they were not designed for somebody suffering from CVI, though, right? No, the court said they were designed for somebody suffering from CVI, but she found that if your symptoms were low, or if you were in the early stages of disease, then in that case she did not think that CVI constituted a physical handicap. And that's simply incorrect. She says, I think it's page 18 of the opinion, she agrees. All of these things, she says that these are designed to, specially designed to treat this condition. They're specially designed. They squeeze your leg so that blood and lymph will move back away from your leg and away from gravity. And she talks about the symptoms that are suffered by people in the early stages. Varicose veins, tired, heavy, achy legs. These impair your ability to move, to walk, to stand for long periods of time. People who have these conditions buy these socks and use these socks specifically because without them they will suffer. And that's the problem. And what the court did here is, first of all, the court latched on to the symptomatic nature. And again, Nairobi protocol goods don't necessarily have to treat symptoms. If I understand what the Court of International Trade said, it said, one, these items are designed to treat mild to moderate conditions, right? Mild to moderate symptoms of an ultimately debilitating condition. Mild to moderate isn't a handicap because it doesn't substantially interfere with a life activity. I think that's a problem, Your Honor, because... Am I stating correctly what the Court of International Trade held? Yeah. The Court of International Trade made a medical rather than a legal judgment. The Court of International Trade said, CBI is not a handicap if the symptoms are mild. And that's not what the law requires the court to do. And that's a real big problem here. The Nairobi protocol provision does not invite the court to play docker. And that's, I think, what happened here. And I think it's very important. So how do you discern whether or not you come within the statutory text that Judge Romali and I were referring to earlier? If there's a huge span of the symptoms and the effect they have on people, how do you draw the conclusion that it substantially limits one of the major life activities? Because if you have the condition to the point that you need to apply compression to your legs, that's limiting your life activity. And I think that's what the court needs to understand. That's a medical judgment? The only medical testimony was put on by plaintiffs, yes. And the two doctors the plaintiffs had testify indicated that, yeah, this is prescribed for people whose swelling is generally mild. You know, however... So mild that your expert actually testified that are essentially, they're not much different from ordinary socks. They're significantly different from ordinary socks. The compression is only slightly greater than ordinary socks. Well, greater. But the point is, it can be slightly greater. And this is the funny thing. The customs doesn't even disagree if the compression is higher that these products are orthopedic socks for the handicapped. But where are we going to draw the line between mildly handicapped and grossly handicapped? And that's the problem. Well, I mean, the court said that the focus has to be on whether the product at issue is specially designed for handicapped persons according to the statutory meaning, not whether incidental use of the product could help someone who might happen to be handicapped. Well, it is. She held that they were specially designed for people suffering these lower limb problems. And what's really interesting is she seizes on the CEAP... The question is whether those problems satisfy the requirement of substantially limiting one or more major life activities. And Your Honor, I believe it does. I mean, remember, you're not required to be bedridden. You're not required to be in deep pain. You know, you're not required to be immobilized in order for this to happen. I mean, examples we gave included, for example, a suit with magnetic closures for people who have arthritis or Parkinson's disease and find it hard to do a button. The Nairobi protocol does not invite the court to make a judgment about whether that person's arthritis or Parkinson's is severe or not. The medical judgment tells you that you have this symptom, you have this permanent disease, which if untreated will debilitate you. These socks treat your condition so that you don't become debilitated, or they put it off. There is an extreme rule of liberality of interpretation of this provision. This provision is not in competition with any other provision of the tariff. And what I think is interesting, in the lower court took a look at the CEAP scale, which is a medical scale that measures the severity of the symptoms of the handicap. And she said, I'm dividing that in half. Oh, anything in the scale 0 to 2, not a handicap. Well, that's not what the medical rule is. Anything 3 and above is a handicap. And that's a problem, because what you're inviting the courts to do here, and they've never done it before. This is the first court case that ever denied Nairobi protocol treatment to a specially designed article. You will be inviting the court to make medical judgments. And that's not what this law calls for. You're into your rebuttals. I will reserve for rebuttal. Thank you, Your Honor. Your Honors, may it please the court. Plaintiff's counsel, Mr. Peterson, has misstated what the trial court's decision actually found. It found that these goods were designed for, at most, varicose veins. They were not designed for chronic venous insufficiency or lower limb lymphedema. Those are other products. Well, I mean, the court specifically said it was specially designed for people with CBD, but at low levels. Yes, that's right. It said that. Yeah, it's designed for lower level CBD, and those are up to varicose veins. So it's either no clinical symptoms of chronic venous disease or varicose veins, but nothing higher. That's a different product that is designed for chronic venous insufficiency. Chronic venous insufficiency describes from edema up to ulcers. That's not what these products are designed for. These products are, as we've discussed, are designed for, at most, varicose veins, but they're also marketed and intended for use as a prophylaxis for pregnant women, if you're traveling long distances. I don't know anything about the technology, but what about if this hosiery was designed to aid people at the early stages so that they wouldn't progress to the later stages? There's nothing in the record to suggest that this disease is necessarily progressive. You may just have varicose veins your entire life, and that's it. There's no... But if you treat them and you wear this hosiery at the early stages, and you prevent starts of swelling and all of that stuff, wouldn't that necessarily help the progression, deter the progression? But the statute requires that it be a permanent and chronic impairment that substantially limits a major life activity. In and of itself, varicose veins, or no symptoms, or used as a temporary prophylaxis, that's not a chronic or permanent impairment that's substantially a major life activity. If you have varicose veins, no clinical symptoms, or you're using this as a temporary prophylaxis, you can walk, you can work, you could carry out all of life's major activities. At worst, with those conditions, you may have tired legs at the end of the day. But in other words, you do those major life activities better if you're wearing a product. Yeah, but then again, there's a performance... Analogize it to just a different product line that SIGBAR has, which is a sports line. You see athletes wearing these sleeves and these compression garments on their legs, so they can perform better during events. Absent those products, they're not handicapped, and they're the same type of products. These products here, absent these products, you are working, you're walking, you're standing. And again, the record shows that at worst, at very worst, you may have tired legs at the end of the day. So then doesn't that pose a problem with respect to the specially designed... I mean, the one finding that the court made that's troubling is that specially designed for people that suffer from CVD. I mean, I think the better argument you would have is that they're not specially designed for anyone particularly suffering from anything, just people who want their legs to be less tired at the end of the day. I completely agree with you, Your Honor. But so what do we do with that factual finding? I don't think it's a factual finding. I think it's a legal finding because specially designed, it's how that term is used in 9817 in the statute. I think a more accurate conclusion that the trial court could have made is to say it's just designed for these lower level CVD, but it's not specially designed because specially designed is a term used in the statute to show that it's specially designed for physically handicapped persons. And that's a finding that is a decision that the court didn't make because it said that lower level CVD, which these goods are designed for, does not rise to the level of a good design for physically handicapped persons. It shouldn't have used the word specially, the lower court. How do you draw the line, though, between making a medical decision and making a specially designed decision? I think you have to look at the specific condition, if any, that the goods are designed for. So let's look at the specific condition, and we don't look at the most severe symptoms of that condition. We don't look at anything beyond the ambit of what those goods are designed for. There's uncontrovertible proof in the record that Sigvaris, they make these goods to appeal to a general population. They're over-the-counter goods. You don't need a prescription. You don't have to be under a doctor's care. There's no contraindication if you were to just go to CVS or whatever and buy one of these things and put these on because they're at such a low level of compression. If you have CVI or an open ulcer, well, then you would most likely be under a doctor's care. It would be a prescription-based. It would be a custom product, not an over-the-counter product, and that product would have contraindications because at higher levels of compression, there could be problems with arterial insufficiency. You don't want to have problems with blood clots or the like. But these products are the minimal amount of compression, of compression hosiery that are on the market. They're called a class one stocking. They're in Sigvaris' well-being line. They're over-the-counter line. It's not in their sports line. It's not in their medical line. They have medical line products. These are not what we're talking about. These goods are only designed for, at most, varicose veins, and they're also as a temporary prophylaxis. They're not for CVI. They're not for lower lymphedema. Those are other products. Mr. Peterson stated that the court found that these are designed for those higher symptoms and for lower lymphedema and CVI. That's not true. That's not in the record. Does the court have any other questions on the government's position or any other matters they would like to address? No. Okay. Thank you, Your Honor. As the court affirmed the trial, the court's decision will be left. Thank you. Thank you. On the question of special design, the record reflects that these socks are made in a particular way to apply graduated compression at specific levels, specific millimeters of mercury. The record indicates that they're made especially on circular knitting machines, which maybe make one sock every 20 minutes. You can go to the store and expect to pay anywhere from $50 to $70 for a pair of these. So the special design is very clear. The court noted in its opinion and talked about this being used and prescribed by people who have CVD. It says, symptoms experienced by people suffering from the early stages of CVD include varicose veins as well as heavy, tired, and achy legs. Those are things that substantially impair normal life activities. Those who are unafflicted by these things may be used to standing, walking for long periods of time. But if you suffer from CVD, you're going to have a hard time doing that. If you have a job in a retail store or as a policeman, you're not going to be able to do it. These things will never cure your disease. They will help you get by with them. And that's all that's required to do. What about the point that the government made near the end, which is that the especially when it was distinguishing between this hosiery and the compression sleeves, the court said you have to look to marketing and whether or not there needs to have a prescription, whether or not they're specially designed, whether or not they have to be measured, and found completely different circumstances between the hosiery and the compression sleeve. Nothing in the law suggests that you look to marketing. The law is definitional. This product is specially designed for the use of people with physical handicap. It has a broad expansion of a physical handicap. The fact that somebody not handicapped might use it is irrelevant. It's designed for use by the handicapped. If I have no diabetes or no blood problems, I can buy a blood glucose monitor and monitor my blood every day. What I think is very important is that when you take a look at how the court treated the arm compression sleeves, it did nothing to look into the severity of the handicap. You know, how bad is the swelling on a particular day? A woman who's had a mastectomy and lost some of her glands may have serious swelling on a given day, no swelling on another day. And what the court said is, yeah, these things are sometimes used by people suffering that. And I think in closing, your honors, I think the important thing is this is a legal definition and it is a broad definition. There is a rule of liberality associated with it. Congress made clear that this was to be given a more liberal interpretation than even the Nairobi Protocol itself. We do not want to have a situation where the court comes in and makes a medical judgment and when the medical doctors say, here's a scale of symptoms of people suffering a recognized permanent debilitating disease, the court comes in and says, well, to this point in the scale, it's not a disease. It's only a point of a scale. It's only a disease or a handicap after this point in scale. That's what the court did here and I don't believe this law gives any guidestones that would let future courts make that determination. So I would urge you to reverse the decision of the Court of International Trade. Thank you. Thank you. We thank both sides. The case is submitted. That concludes our proceedings for this morning. All rise. The Honorable Court is adjourned until tomorrow morning at 10 a.m.